HEANEY, Circuit Judge,
concurring.
I concur in every aspect of the majority’s opinion except insofar as it holds that the LRSD has implemented “programs, policies and/or procedures designed to ensure that there is no racial discrimination with regard to student discipline,” as required by section 2.5 of the Revised Plan. In my view, the LRSD has failed to meet this obligation.
It is true that the LRSD has implemented several programs with regard to student discipline: the LRSD provided every student, parent, teacher, and administrator with a copy of the Student Handbook; the LRSD trained students, teachers, and administrators on provisions in the Handbook; the LRSD created the position of Ombudsman to investigate student complaints of race-based mistreatment in student discipline; Dr. Linda Watson, the Assistant Superintendent who was responsible for implementing section 2.5 of the Revised Plan, reviewed every long-term suspension and expulsion, and any short-term suspensions that were appealed; Dr. Watson prepared and reviewed quarterly Discipline Management Reports from each school, used these reports to identify problems, and met with the schools’ administrators to discuss solutions; the LRSD established alternative learning environments to allow students with behavioral problems to remain in school; the LRSD offered training in classroom management and effective discipline; and the LRSD followed a progressive discipline approach by imposing lesser sanctions before suspending students.
It is also true that the LRSD has reduced the total number of disciplinary sanctions of students during the time of the Revised Plan from 5,312 total sanctions in 1998, to 5,080 total sanctions in 2001.[5] During that same period, however, the number of black students receiving disciplinary sanctions actually increased. During the 1998-99 school year, there were 4,470 disciplinary sanctions of black students compared to 842 disciplinary sanctions of white students. Put another way, in the first year of the Revised Plan, 65% of the student population in the LRSD was black, while 84% of the disciplinary sanctions were of black students. By 2001, the year the LRSD sought unitary status, the disparity was even greater. In the 2000-01 school year, there were 4,534 disciplinary sanctions of black students compared to 546 disciplinary sanctions of white students. In other words, black students consisted of 68% of the student population, but accounted for 89% of the disciplinary sanctions. Therefore, from 1998 to 2001, disciplinary sanctions of black students increased, from 84% to 89%. It is undisputed that the programs instituted by the LRSD to address disciplinary issues have had no positive impact on the racial disparity of student discipline in the district.
If you compare the discipline statistics in the individual high schools for the same period they track in very similar ways with almost all of the schools experiencing an increase in disparity. It is worth noting, however, that Parkview High School, the most integrated high school in the district, *971 has the lowest racial disparity in student discipline in the district. In 1998-99, Parkview’s student population was 51% black and the percentage of disciplinary sanctions of black students was 49%. In 2000-01, Parkview’s black student population was still 51%, but the percentage of disciplinary sanctions of black students rose to 66%. Even at 66%, however, Park-view still had the lowest disparity in student discipline in the district that year.
I agree that the Revised Plan does not require the LRSD to absolutely eliminate racial disparity from student discipline. The majority and the district court, however, rely heavily on the fact that section 2.5 requires the LRSD to implement programs “designed to ensure” that there is no racial discrimination in student discipline. The implication is that because the LRSD implemented programs which would effect student discipline, the actual impact of those programs does not matter. I disagree. It is not enough for the LRSD to list the programs it implemented to address the disparity in student discipline, when the result of those programs was an increase in the racial disparity in student discipline. The mere implementation of programs, no matter how many or how impressive sounding, that have virtually no impact on the racial disparity in student discipline is not enough to meet the district’s obligations under the Revised Plan.
This lack of impact on the disparity in discipline is really no surprise when you review the testimony of Dr. Watson. Dr. Watson testified that: she was never instructed that there needed to be a reduction in the racial impact of suspensions in the district; she never prepared a monitoring report with regard to disparities in discipline; she did not prepare any reports which track whether certain teachers or administrators have a pattern of disciplinary actions based on race; nor did she recommend any programs to address the continued disparate impact of discipline. (Nov. 19, 2001, Unitary Status Hr’g Tr. at 25-163,). Dr. Watson also testified that the percentage of black students being suspended did not decrease, that disparate patterns of discipline still exist based on race, that there are no plans to reduce the disparate impact of student discipline in the district, and that the LRSD is not even looking at student discipline based on race. (Id.)
The majority, and the district court, seem to take solace in the fact that racial disparity in student discipline is a national problem. According to the district court, in 1998, the national “total suspension index” was- 2.24 and the Arkansas “total suspension index” was 2.16, whereas the LRSD’s “total suspension index” remained constant at 1.26 from 1997-2000. Little Rock Sch. Dist. v. Pulaski County Special Sch. Dist. No. 1, 237 F.Supp.2d 988, 1054 (E.D.Ark.2002). The majority and the district court consider the fact. that the LRSD’s index is lower than that of the nation and the state significant, and the fact that the LRSD’s index did not change over the period of the Revised Plan insignificant. I disagree. The Revised Plan said nothing about the LRSD’s racial disparity in student discipline in comparison to the state or the nation. The Revised Plan did, however, require the LRSD to implement programs designed to ensure that the racial disparity in student discipline in the district would decrease. This, they faded to do.
■ The majority and the district court also assert that Joshua did not meet its burden in proving that the racial disparity in student discipline was the result of discrimination. This was not Joshua’s burden. According to section 11 of the Revised Plan, Joshua bears the burden of proving that the LRSD failed to comply with its obligations as set forth in the plan. Joshua met this burden by showing that the *972 programs the LRSD implemented to address the racial disparity in discipline were ineffective. As I read the Revised Plan, it was the LRSD’s obligation to determine whether the continued disparity in discipline was the result of racial discrimination or merely socioeconomic factors as suggested by Dr. Watson. Here again, the LRSD failed to meet its obligation and rested merely on the fact that it implemented programs. Programs that, in the end, had no effect on the racial disparity in student discipline.
It is true that Joshua could have done more to raise concerns about the failure of the LRSD’s programs earlier, but this does not remove all responsibility from the LRSD. The statistics compiled and reports filed by the LRSD lack valuable data. I have found no useful statistics on recidivism among students to determine how many students, and of what race, are receiving multiple disciplinary sanctions. The record does not contain statistics that separate offenses involving the discretionary judgment of staff from objective offenses. The record lacks any reports which show whether there is a correlation between the race of the teacher administering the discipline and the race of the student receiving it, or whether certain teachers have a higher rate of discipline than others. Dr. Watson testified that she was able to access some of this information and that she knew which schools had high rates of disciplinary sanctions and which teachers issued more suspensions than others, but I cannot agree that her personal, undocumented knowledge was sufficient to meet the court’s mandate that the district implement programs, policies, and procedures designed to ensure that there is no racial discrimination with respect to student discipline.
Absent the necessary records, there is no way the district court, or this court, can reach an informed conclusion as to whether blacks are disciplined more frequently for legitimate reasons or because they are judged by different standards than white students, at least by some teachers. I would remand this case to the district court on the disciplinary issue, along with the issue of student achievement retained by the district court, to require the district to comply with our original mandate.

. All 1998 statistics are from the LRSD's 1998-1999 Annual Disciplinary Management Report (Ct.Ex. CX679) and the 2001 statistics are from the LRSD’s 2000-2001 Annual Disciplinary Management Report (Ct.Ex. CX681).